UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| TIMOTHY McKINNEY, Individually and ) <br> As Personal Representative of the Estate of ) <br> Michael McKinney, Deceased, and LISA ) <br> McKINNEY, Individually, ) <br>       Plaintiffs, ) <br> ) <br>   vs. ) <br> ) <br> ROBERT DUPLAIN, GENE BURTON, In ) <br> their Individual Capacities, ) <br>       Defendants. ) | 1:04-cv-294-RLY-TAB |

**ENTRY ON DEFENDANT ROBERT DUPLAIN'S MOTION FOR SUMMARY JUDGMENT**

On Sunday, November 8, 2003, Michael McKinney died after being shot four times by Robert Duplain, a Ball State University police officer. Michael's father, Timothy McKinney, acting in his own right and as representative of his estate, and Michael's mother, Lisa McKinney, bring this action against Officer Duplain under 42 U.S.C. § 1983 for excessive force in violation of the Fourth Amendment. Officer Duplain now moves for summary judgment. For the reasons explained below, the court **DENIES** the motion.

**I.  Factual Background**

On the evening of November 7, 2003, Michael and some of his friends went out to various bars near the Ball State campus. In the early morning hours of November 8, 2003, he ended up at an area near the campus called The Village. Michael's last

destination was BW3s, where he remained until it closed at 3:00 a.m.  By this time, Michael was severely intoxicated.

Shortly after leaving BW3s, Michael was seen on North Street across from the home of Jane Poole.  At approximately 3:15 a.m., Brent Archambault observed Michael in front of Poole's house.  Noting that Michael appeared intoxicated – he was off balance, swayed his head back and forth, and was unable to get up off the ground on his own – Archambault approached him and asked him if he needed help.  Michael told him to leave him alone.

Shortly thereafter, Michael entered Poole's backyard, where he knocked or banged on the patio door for approximately two minutes.  Michael's friend, Phil Justevice, opined that since he lived so near Poole, Michael was probably under the mistaken assumption that Poole's house was in fact Justevice's house.  Poole went downstairs, flipped on the outside light, peeked through the blinds of the patio door, and noticed a white male whom she did not recognize.  Fearing for her safety, she reported the situation to Delaware County 911 at approximately 3:26 a.m.  Poole then hung up and called her neighbors, Mike and Nancy Ellis.

The Muncie Police Department quickly sent out a dispatch call.  Initially, MPD directed officers to "1325 W. North on a burglary in progress."  (Defendant's Ex. A, ¶ 5).  A few moments later, MPD dispatch reported an "emergency at 1325 West North," and the following:

Female advised there was a subject pounding on the door.  It was a white

2

> male with no hair.  He's still pounding at the back door.  Female subject
> just hung up on us.  Trying to make contact back.  All units unable to make
> contact back to female.

(*Id.* ¶¶ 8-9).

Four Ball State University police officers heard the call and responded: Officer Duplain, Officer Matt Gaither, Officer Eric Perkins, and their shift supervisor, Cpl. David Ball.  They drove separate vehicles to the Poole residence and arrived between 3:26 a.m. and 3:27 a.m.  Officer Gaither checked the front of the house, and Cpl. David Bell and Officer Perkins moved up the east side of the house with their weapons drawn.  As they approached Poole's backyard, Cpl. Bell and Officer Perkins discovered their access blocked by a six-foot tall privacy fence, which ran from the southeast corner of the Poole residence, curved around the backyard, and joined an unattached garage on the south side.  Through the slats of the fence, Officer Perkins could see a silhouette of a person in the back yard.

When Officer Duplain entered the backyard, Michael was under a tulip tree approximately 20 feet from Poole's back door. What happened next is the subject of vigorous dispute.  After Officer Duplain shouted a few words to Michael, Michael allegedly turned toward Officer Duplain and either lunged or ran toward him.  Within seconds, Officer Duplain shot Michael four times.

Within a second or two of hearing the shots, Cpl. Bell reported "shots fired" on his police radio.  According to the Ball State University Police Department Computer Aided Dispatch Call Information printout, the "shots fired" call came at 3:27:56 a.m., 29

3

seconds after Officer Duplain was logged as present at the scene. Cpl. Bell then entered the back yard, and saw Officer Duplain standing upright with Michael at his feet. Cpl. Bell turned Michael on his back and began to perform CPR. Michael was taken to Bell Memorial Hospital, where he was pronounced dead.

Dr. Scott Wagner, a board-certified forensic pathologist, conducted the autopsy of Michael at St. Joseph Hospital in Fort Wayne that day. The autopsy report disclosed four gunshot wounds, listed in order from the top of the body to the bottom: (1) an entrance gunshot wound just below the eye; (2) an entrance gunshot wound to the left chest which pierced the left and right ventricles of the heart, range undetermined; (3) an entrance gunshot wound to the left shoulder which shattered the humerus bone, range undetermined; and (4) an entrance gunshot wound to the left lateral chest, range undetermined. Toxicology showed that Michael's blood alcohol level was .343. (Defendant's Exhibit J).

## II.   Discussion

In an action based upon 42 U.S.C. § 1983, a plaintiff must show "(1) that 'the conduct complained of was committed by a person acting under color of state law'; and (2) that 'this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Marvin v. King*, 734 F.Supp. 346, 349 (S.D.Ind. 1990) (quoting *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir. 1989)). Here, Defendants do not dispute that they were acting under color of state law. Thus, the only issue is whether Officer Duplain's use of force on November 8, 2003, was reasonable.

"[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen, should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Whether the officer's use of force was reasonable under the Fourth Amendment is an "objective inquiry," *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997); *Mason v. Hamilton County*, 13 F.Supp.2d 829, 833 (S.D. Ind. 1998), implemented "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003);  *Graham*, 490 U.S. at 396.  "The test of reasonableness . . . requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  Deadly force is reasonable "if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm" and is about to escape.'" *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002) (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).

     The court finds there are genuine issues of material fact as to whether it was objectively reasonable for Officer Duplain to use deadly force during his encounter with Michael on November 8, 2003.  First, there is an issue of fact as to whether it was

5

reasonable for Officer Duplain to believe that the situation he encountered posed a threat of serious physical harm to him or to others.  The evidence reflects that officers were alerted to the fact that a man was knocking on Poole's back door in an attempt to enter her residence.  Further, Poole prematurely hung up during her 911 call, alerting dispatch to the fact that the situation may have escalated.  There is also evidence to show, however, that Poole lived near The Village, an area of the Ball State campus known for its bars.  Thus, it was not uncommon for intoxicated college students to frequent her neighborhood at late hours.  Nor was it unusual for the BSUP to receive calls involving intoxicated individuals, particularly on Saturday nights while Ball State was in session.  Sergeant Rhonda Clark testified that 75-80% of the calls that BSUP receives concern intoxicated college students. (Plaintiffs' Ex. AA at 18).  Second, there is conflicting evidence as to whether Officer Duplain sufficiently alerted Michael to his presence on the scene.  *See Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988) (whenever possible under the circumstances, an officer should try to identify himself as a law enforcement officer to the suspect).  Officer Duplain remembers saying, "Police.  Show me your hands.  Get on the ground.  Get the fuck on the ground.  Get on the ground now."  (Plaintiffs' Ex. L at 140).  Mike Ellis, who watched the encounter take place from his second floor bedroom, heard him say, "hey, hey" and possibly "stop right there."  (Plaintiffs' Ex. T at 35).  Poole, behind her patio doors, only heard the word "hey."  (Plaintiffs' Ex. K at 18).  Third, Officer Duplain testified that he shot at Michael as he charged toward him.  (Plaintiffs' Ex. L at 104).  This fact is contradicted by the forensic evidence submitted by

6

Plaintiffs. (Plaintiffs' Exs. R, Z, CC at 107, GG at 112-18). Indeed, there is even conflicting evidence on the sequence of the shots fired. (Plaintiffs' Exs. EE, GG at 44-48, II at 9-10). Finally, there is an issue of fact as to whether the number of shots fired was reasonable under the circumstances.

The court now turns to Duplain's defense of qualified immunity. "Qualified immunity protects government officials from civil liability when performing discretionary functions so long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Walker v. Shansky*, 28 F.3d 666, 670 (7th Cir. 1994). In determining whether qualified immunity applies, the court employs a two-step inquiry. *Saucier v. Kath*, 533 U.S. 194, 200 (2001). First, taking the facts in the light most favorable to the non-moving party, the court asks whether the facts alleged show the officer's conduct violated a constitutional right. If so, the court must determine "whether the right was clearly established." *Id*. at 201; *Leaf v. Shelnutt*, 400 F.3d 1070, 1079-80 (7th Cir. 2005). "This inquiry is a specific one: The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Id*.

With regard to the first prong of the inquiry, and for the reasons articulated above, the court finds there are genuine issues of material fact as to whether Michael was 'unreasonably seized' under the Fourth Amendment. With regard to the second prong of

7

the inquiry, the court finds the law was clearly established that deadly force is only reasonable in the two circumstances described above and announced in *Tennessee v. Garner, supra.* – i.e., if the armed suspect poses a threat of serious physical harm, or the suspect committed a crime involving the infliction or threatened infliction of serious physical harm and is about to escape.

In sum, because material issues of fact remain as to the objective reasonableness of Officer Duplain's use of deadly force on the night of November 8, 2003, Defendant's Motion for Summary Judgment must be **DENIED**.

**SO ORDERED** this 24th day of August 2005.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Lester H. Cohen
DEFUR VORAN
lcohen@defur.com

Michelle Lynn Cooper
DEFUR VORAN LLP
mcooper@defur.com

Geoffrey Nels Fieger
FIEGER FIEGER KENNEY & JOHNSON
info@fiegerlaw.com

Robert M. Giroux Jr.
FIEGER FIEGER KENNEY & JOHNSON
info@fiegerlaw.com

John F. Kautzman
RUCKELSHAUS ROLAND KAUTZMAN BLACKWELL & HASBROOK
jfk@rucklaw.com

Thomas R. Malapit
DENNIS WAGNER & ABRELL PC
malapit@dwapc.com

David M. Mattingly
ICE MILLER
david.mattingly@icemiller.com

Scott E. Shockley
DEFUR VORAN
sshockley@defur.com

Bradley L. Williams
ICE MILLER
williamb@icemiller.com